UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:20-cv-12203

| | |
|---|---|
| JESSE ANDERSON, <br>                    Plaintiff, <br><br> v. <br><br> OFFICER NATHAN REID, SERGEANT JOSEPH COTTER <br><br> and <br><br> TOWN OF SANDWICH, <br>                    Defendants. | **COMPLAINT** |

Plaintiff Jesse Anderson, by counsel, for his Complaint, states as follows:

## Jurisdiction

1. The amount in controversy in regard to the claim that is the basis of this Complaint is in excess of $75,000.00, exclusive of interest and costs.

2. This Court has jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), 42 U.S.C. §§ 1983, and 1988 and 42 U.S.C. § 12101 (Americans with Disabilities Act).

## Venue

3. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(1) as it is where all defendants reside, and 28 U.S.C. § 1391(b)(2) as that is where a substantial part of the events or omissions giving rise to the claim occurred.

## Nature of the Case

4. This is an action for money damages for personal injuries suffered by plaintiff Jesse Anderson as a result of the violation of his 4th Amendment rights under the United States

Constitution by defendant police officers Officer Nathan Reid and Sergeant Joseph Cotter. Said officers utilized excessive force in taking the mentally ill plaintiff into protective custody. In addition, defendant Town of Sandwich, the officers' employer, is vicariously liable for said officers' violation of the Americans With Disabilities Act, in that they discriminated against plaintiff by failing to accommodate his disability when taking him into custody, causing him to suffer greater injury than someone without such disabilities.

### The Parties

5.  Plaintiff Jesse Anderson ("plaintiff") is an individual residing in Mount Pleasant, SC, and is a citizen of the State of South Carolina.

6.  Defendant Officer Nathan Reid ("Reid" or, "Officer Reid") is and was at all times material hereto, an individual employed as a police officer by the Sandwich Police Department of the Town of Sandwich, and resides in East Sandwich, Massachusetts

7.  Defendant Sergeant Joseph Cotter ("Cotter" or, "Sgt. Cotter") was at all times material hereto, an individual employed as a police sergeant by the Sandwich Police Department of the Town of Sandwich, and resides in Sandwich, Massachusetts.

8.  Defendant Town of Sandwich ("the Town") is a municipal corporation chartered and existing under the laws and constitution of the Commonwealth of Massachusetts, but is not a "state" for purposes of immunity under the Eleventh Amendment to the Constitution of the United States. It was also the public employer of defendants Reid and Cotter at all times relevant to this Complaint.

### The Facts

9.  Plaintiff, now 34 years old, was raised in Sandwich, Massachusetts by his parents Martha Anderson ("Mrs. Anderson" or, "his mother") and Richard Anderson ("Mr. Anderson" or

"his father"), along with his two brothers.

10. Prior to and on January 6, 2018, plaintiff had a difficult and sometimes turbulent
    relationship with his father, Mr. Anderson.

11. Prior to and as of January 6, 2018, plaintiff had been diagnosed with major depressive
    disorder and panic disorder, and was under the care of a psychiatrist.

12. Major depressive disorder and panic disorder each can cause a person suffering from either
    or both to be angry and frustrated.

13. After moving away from Sandwich in 2012, and living and working out of state for a
    number of years, plaintiff and his wife Chelsie Anderson ("Chelsie" or, "his wife") moved
    back to the Sandwich area in 2016.

14. Sometime in December, 2017, plaintiff and his wife moved in with his parents at
    plaintiff's childhood home at 20 Grove Street, Sandwich, Massachusetts; around that same
    time, plaintiff began working at his father's construction company to help his father.

15. Soon after moving back in with his parents and working with his father as aforesaid,
    plaintiff started becoming very stressed and emotionally upset, which stress and upset were
    largely precipitated by conflicts with his father.

16. In the days leading up to January 6, 2018, plaintiff's level of stress and emotional upset
    increased.

17. Plaintiff spent the night of January 5th-6th in his car, parked at his parents' home, during
    which time he drank alcoholic beverages to excess.

18. At all times relevant to the Complaint, and in particular at no time after waking on January
    6, 2018 was plaintiff intoxicated or under the influence of drugs that day.

19. Upon waking on January 6, 2018, plaintiff decided that he could not endure another day at

his parent's home, and informed his mother and his wife that he needed to leave right

away; that he would travel to Florida to stay with a friend for a while.

20. Due to plaintiff's level of emotional upset at this time, his mother and his wife did not

want to give him the keys to his car, and for a brief period withheld those keys from him.

21. Upon the keys being withheld as aforesaid, plaintiff became angry and threatened to kill

himself, which caused his mother to hand him the keys.

22. At some point on January 6, 2018, Mrs. Anderson had telephoned Mr. Anderson, and

asked him to come home to help with the unfolding situation with their son.

23. Plaintiff, after getting possession of his car keys, then drove his car down the driveway of

his parent's home, on his way to the airport.

24. However, his father having just arrived at the family home, plaintiff found his means of

egress to the street blocked by his father's vehicle.

25. Plaintiff thereafter backed his car up the driveway, drove on to a neighbor's property, and

then drove down the neighbor's driveway, in an attempt to again reach the street and make

his exit.

26. However, his brother Caleb Anderson ("Caleb" or "his brother"), having been asked by

his father in a telephone call to assist in protecting plaintiff, had by this time arrived at the

family home; Caleb used his vehicle to block plaintiff's egress to the street from the

neighbor's driveway.

27. His attempts at exiting having been thwarted as aforesaid, plaintiff became even more

emotionally upset and angry.

28. Soon after Caleb blocked his exit as aforesaid, plaintiff got out of his car and, at some

point, Caleb shoved plaintiff; Caleb and his father then took plaintiff to the ground and

restrained him, all without any punches being thrown.

29. After plaintiff promised to calm down, Caleb and Mr. Anderson let him up from the
ground.

30. At this point, plaintiff was still visibly upset, but he had calmed down somewhat; he then
returned to his car and backed it up the neighbor's driveway and into the yard of a property
adjoining plaintiff's parent's home and owned by them.

31. Plaintiff then parked the car, and stayed inside with the engine running.

32. By this time, Mr. Anderson had telephoned the Sandwich Police Department, asking for
help in dealing with plaintiff.

33. In Mr. Anderson's aforementioned telephone call to the Sandwich Police Department,
he informed a police dispatcher that he had a son who was "out of control". The call
ended, and the dispatcher then informed one or both of the defendants via police radio that
there was someone who had an "out of control son" at 20 Grove Street and to proceed
there.

34. The aforementioned Sandwich Police dispatcher then telephoned Mr. Anderson back, and
Mr. Anderson informed the dispatcher that plaintiff had been 'fighting with his brother and
me", and that he was "out of his mind". He further told the dispatcher that plaintiff was in
a car but that "we have him blocked". In answer to the question, "Has it been physical?",
Mr. Anderson answered "yes", but quickly added that he "didn't want any charges
pressed". He also told the dispatcher that he didn't think plaintiff was under the influence
of anything, but that he had been having some "psychotic problems".

35. Within minutes after the aforementioned telephone calls between Mr. Anderson and the
Sandwich Police Department, defendants Officer Reid and Sgt. Cotter together arrived on

scene.

36. Mr. Anderson's father had worked with defendant Cotter in the Sandwich Police Department years earlier. Mr. Anderson knew defendant Cotter, and told him that plaintiff was having mental issues, and that he may not have been taking his medication properly. Mr. Anderson further told defendant Cotter that he wanted plaintiff, his son, to be taken to a hospital for help.

37. Defendant Sgt. Cotter approached the vehicle in which plaintiff was sitting, and calmly and professionally worked to de-escalate the situation.  Defendant Cotter told plaintiff, inter alia, "Your grandfather would not want this", and "It's cold and icy out, and we don't feel like screwing up our legs. We don't want to wrestle", and was otherwise taking a gentle approach to establishing communication with plaintiff, and to get plaintiff to calm down and to convince him to voluntarily get out of the car.

38. As a result of defendant Cotter's approach, plaintiff was starting to calm down and be less agitated.

39. While defendant Cotter was making his aforementioned gentle and professional approach to get plaintiff to calm down and exit his car, defendant Reid was waiting nearby behind some bushes, with his taser weapon out of its holster and in his hand.

40. Defendant Reid then walked up to plaintiff's vehicle and, taking control of the situation from the more senior-ranking defendant Cotter, immediately began exhibiting a forceful and aggressive approach with plaintiff.

41. Defendant Reid immediately began escalating the situation, yelling repeatedly at plaintiff with profanities, ordering him to turn his car engine off, throw the keys out the car window and exit the vehicle.

42. As a result of defendant Reid's aggressive behavior as aforesaid, plaintiff became more angry and agitated.

43. Plaintiff then complied with the directives to turn the engine off, throw the keys out the window and exit the vehicle, while yelling profanities back at defendant Reid, and was otherwise in a very distressed state.

44. Plaintiff told defendant Reid that he did not have any weapons, and was not under the influence of drugs or alcohol.

45. After plaintiff threw his keys out the car window and exited the car as aforesaid, defendant Reid then screamed at plaintiff multiple times to drop to his knees and put his hands behind his head.

46. At the time he exited the car, plaintiff was wearing bedroom slippers, and the ground where plaintiff was standing was covered by a sheet of ice that was pitted, irregular and had areas of frozen snow on top.

47. Upon exiting the car, plaintiff explained to defendant Reid that he had recently had surgery on his knee and was not physically capable of dropping to his knees; plaintiff asked defendant Reid if they could all just calm down and talk.

48. Chelsie Anderson, who had been watching the events unfold, then confirmed to defendant Reid that plaintiff had recently had knee surgery, and could not get down on his knees.

49. Defendant Reid nevertheless continued to scream at plaintiff to drop down on his knees, and continued to hold the taser weapon in his hand throughout this confrontation with plaintiff, thereby continuing to escalate the situation.

50. By the time plaintiff exited the vehicle as aforesaid, there were a total of three Sandwich Police Department officers at the scene, including defendants Reid and Cotter.

51. At some point while defendant Reid was still ordering plaintiff to drop to his knees and holding the taser gun, plaintiff, still standing outside his car, said, "I just want to leave", turned and started walking from defendant Reid and the other police officers on site, doing so very slowly to avoid slipping and falling on the sheet of ice that he was traversing in bedroom slippers.

52. At no time after plaintiff turned to walk away as aforesaid did anyone warn plaintiff that he would be "tased".

53. At no time relevant to the Complaint, did anyone explain to plaintiff why the police were there, or whether he was being arrested or otherwise being taken into custody, and if so, why.

54. At no time relevant to the Complaint did defendants Reid or Cotter hear or otherwise become aware of any threats by plaintiff to do harm to himself, to either of them or to anyone else.

55. At no time relevant to the Complaint, were there any "split-second" decisions required of defendants Reid or Cotter in regard to actions to be taken or avoided concerning plaintiff.

56. At no time after plaintiff threw his keys out the car window and exited the vehicle, if not earlier, could defendant Reid or defendant Cotter have reasonably believed that plaintiff was a threat to himself or anyone else.

57. As he slowly walked away as aforesaid, defendant Reid fired his Sandwich Police Department-issued X26 model taser gun, causing two electrified probes to attach to plaintiff's back, shocking him, and thereby causing immediate neuromuscular incapacitation; his body slammed down onto the ice, his head striking the hard surface, leaving him lying on the ice, still incapacitated from the "tasing".

58. Once defendant Cotter allowed defendant Reid to take control over the situation as aforesaid, defendant Cotter -despite his being the more senior-ranking officer on the scene, despite his supervisory role at the scene, and despite his earlier recognition that a gentle, de-escalating approach was required when dealing with someone in plaintiff's state of mind and mental dysfunction- took no action to eliminate or curtail defendant Reid's aggressive and escalating behavior towards plaintiff, nor did he attempt to prevent defendant Reid from firing his drawn taser in the above-referenced circumstances.

59. Prior to defendant Reid "tasing" plaintiff, defendant Cotter, having observed defendant Reid's aforementioned actions towards plaintiff, had the authority and the opportunity to stop defendant Reid from escalating the situation as aforesaid and/or to order defendant Reid to refrain from firing his drawn taser at plaintiff, but never did either.

60. The rules of the Sandwich Police Department governing the use of electronic weapons, including taser guns, in effect in January 2018, specifically prohibited firing a taser at a person "in an environment where the subject's incapacitation could reasonably result in death or serious injury to the subject or others", and, on information and belief, defendants Reid and Cotter knew this at all times relevant to the Complaint.

61. Sudden, unexpected neuromuscular incapacitation of a person wearing bedroom slippers and walking on a sheet of pitted, irregular ice with chunks of hard snow on top could reasonably result in serious injury to the person so incapacitated.

62. As a result of his being "tased" by defendant Reid and his subsequent fall and striking of his head on the ice beneath him, plaintiff sustained permanent and life-altering injuries, suffered and continues to suffer pain of body and mind, incurred and continues to incur medical expenses, and has suffered and continues to suffer other economic losses.

63. While plaintiff was lying on the ice, still in a state of incapacitation as aforesaid and unable to obey commands, defendant Reid "tased" plaintiff again.

64. Apparently, defendants Reid and Cotter were in the course of taking plaintiff into custody for the purpose of protecting him from harm, when he was "tased" by defendant Reid and thereby severely and permanently injured.

65. At all times relevant to the Complaint, Defendant Officer Reid and defendant Sgt. Cotter, as members and employees of the Sandwich Police Department acting in furtherance of the business of said police department, were acting under color of state law.

66. Plaintiff was never charged with a crime in regard to the aforementioned events of January 6, 2018.

67. The 4th Amendment to the United States Constitution requires that every American citizen be free from unreasonable search or seizure.

68. There were, prior to and on January 6, 2018, police standards providing protocols for dealing with individuals suffering from mental illness, and such protocols encouraged the de-escalation of conflict when dealing with such persons.

69. On information and belief, defendants Reid and Cotter were trained in the aforementioned police protocols prior to January 6, 2018, and would have been aware on that date that defendant Reid's aforementioned escalation of conflict with plaintiff was in violation of such standards.

70. At all times relevant to the Complaint, it should have been clear to defendants Reid and Cotter as well as to any objectively reasonable police officer, through then-existing case law, including but not limited to *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d. 892 (4th Cir. 2016), training in police protocols for dealing with the mentally ill, and/or through

the exercise of common sense - the same common sense defendant Cotter exercised before

defendant Reid took control of the situation as aforesaid- that the actions of defendant Reid

in escalating the confrontation with plaintiff as well as "tasing" plaintiff under the

circumstances, constituted a violation of his 4th Amendment rights.

71. Title II of the Americans with Disabilities Act ("ADA") is a federal law that applies to

state and local governmental entities, and which protects "qualified individuals" with

disabilities from discrimination on the basis of disability in services, programs, and

activities provided by state and local government entities.

72. Plaintiff, by virtue of his aforementioned diagnoses of major depressive disorder and panic

disorder, was, at all times relevant to the Complaint, a "qualified individual" with a

disability pursuant to said Title II of the ADA.

73. The Town is a local governmental entity and is subject to said Title II of the ADA, and the

Sandwich Police Department, as a department or agency thereof, is likewise subject to the

ADA.

74. When, in the course of taking plaintiff into custody, the defendant Reid substantially

escalated the confrontation with plaintiff, and "tased" him -and defendant Cotter failed to

prevent the escalation and "tasing"- all as aforesaid, in effect those defendants were failing

to reasonably accommodate plaintiff's disability and discriminating against him because of

that disability.

75. It was not a reasonable accommodation of plaintiff's anger and emotional upset,

attributable in whole or in part to his disability of major depression and panic disorder,

where defendant Cotter had been told by Mr. Anderson that plaintiff was having mental

issues and that he may not have been taking his medication properly: 1) to escalate the

confrontation with plaintiff by yelling, using profanity and holding a taser gun, 2) to

order him to get onto his knees when defendants Reid and Cotter were specifically told by

plaintiff (and corroborated by his wife) that he was physically incapable of doing so, and,

3) by rendering him neuromuscularly incapacitated with a taser gun while he was walking

in bedroom slippers on a sheet of pitted, irregular ice with chunks of frozen snow on top of

the ice, all in the context of a man who had committed no crime, had threatened and

presented a threat to no one, and was being taken into custody so that he would be

protected.

76. At all times relevant to the Complaint, defendant Reid was deliberately indifferent to

plaintiff's above-described mental or emotional condition, and in fact, by his above-

described actions both before and after the initial "tasing", displayed actual animus toward

plaintiff and his said disability; and therefore his discrimination against plaintiff and his

aforementioned disability should be deemed intentional.

77. Defendant Reid knew from observing defendant Cotter's calm and professional approach

to plaintiff's anger and emotional upset and the resulting de-escalation that was underway

before he took control of the situation, from the above-referenced protocols, as well as

through common sense, that a reasonable accommodation was not only possible

but warranted and required.

78. Defendant Cotter demonstrated that he was deliberately indifferent to plaintiff's above-

described mental or emotional condition's when he refused to use his supervisory authority

to stop defendant Reid from escalating the confrontation with plaintiff or stop him from

shooting plaintiff with his taser gun, despite knowing and previously demonstrating that

the plaintiff's mental and emotional condition called for the reasonable accommodation of

utilizing a calm, gentle approach.

79. Defendant Cotter's aforementioned deliberate indifference is equivalent to animus toward
    the disabled plaintiff; and therefore his discrimination against plaintiff and his
    aforementioned disability should be deemed intentional.

80. As a result of the aforementioned failure to accommodate plaintiff's disability, plaintiff
    was "tased", which resulted in serious and permanent injury; such injury is far greater than
    would likely have occurred had the plaintiff not had such disability (allowing him to more
    calmly handle the confrontation with police), or had the disability been reasonably
    accommodated with a different approach as described above.

## <u>COUNT I (42 U.S.C. § 1983 claim against defendant Reid)</u>

81. Plaintiff reaffirms and realleges Paragraphs 1 through 80 above as if specifically affirmed
    and alleged herein.

82. The force used by defendant Reid to take plaintiff into protective custody was excessive in
    the totality of circumstances, and constitutes an unreasonable seizure of plaintiff in
    violation of the 4th Amendment to the United States Constitution and therefore in violation
    of 42 U.S.C. § 1983.

83. As a direct and proximate result of defendant Reid's violation of plaintiff's constitutional
    rights and § 1983 as aforesaid, plaintiff was seriously and permanently injured as
    aforesaid.

84. It should have been clear to defendant Reid as well as to any objectively reasonable police
    officer, at all times relevant to the Complaint and for the reasons stated above, that his
    actions in escalating the confrontation with, and "tasing", plaintiff constituted a violation
    of his 4th Amendment rights, and said defendant is therefore not entitled to qualified

immunity from this 42 U.S.C. § 1983 action.

**WHEREFORE, PLAINTIFF JESSE ANDERSON DEMANDS:**

    **A.  JUDGMENT IN THE AMOUNT OF SIX MILLION DOLLARS ($6,000,000.00) AGAINST DEFENDANT OFFICER NATHAN REID;**

    **B.  INTEREST, EXPERT FEES AND COSTS; and,**

    **C.  REASONABLE ATTORNEYS FEES PURSUANT TO 42 U.S.C. § 1988 (b)**

### COUNT II (42 U.S.C. § 1983 claim against defendant Cotter)

85. Plaintiff reaffirms and realleges Paragraphs 1 through 84 above as if specifically affirmed and alleged herein.

86. As a direct and proximate result of defendant Cotter's failure to exercise his supervisory authority over defendant Reid to stop him from escalating the situation with plaintiff and/or firing his taser at plaintiff as aforesaid, plaintiff's constitutional rights were violated as aforesaid, and defendant Cotter was therefore in violation of 42 U.S.C. § 1983.

87. As a direct and proximate result of defendant Cotter's violation of plaintiff's constitutional rights and § 1983 as aforesaid, plaintiff was seriously and permanently injured as aforesaid.

88. It should have been clear to defendant Cotter as well as to any objectively reasonable police officer, at all times relevant to the Complaint and for the reasons stated above, that plaintiff's 4th Amendment constitutional rights would be violated by his failure to utilize his supervisory authority to stop defendant Reid from escalating the confrontation with, and "tasing", plaintiff, and defendant Cotter is therefore not entitled to qualified immunity from this 42 U.S.C. § 1983 action.

**WHEREFORE, PLAINTIFF JESSE ANDERSON DEMANDS:**

    **A.  JUDGMENT IN THE AMOUNT OF SIX MILLION DOLLARS ($6,000,000.00)**

**AGAINST DEFENDANT SERGEANT JOSEPH COTTER;**

**B. INTEREST, EXPERT FEES AND COSTS; and,**

**C. REASONABLE ATTORNEYS FEES PURSUANT TO 42 U.S.C. § 1988 (b)**

## COUNT III (ADA claim against defendant Town)

89. Plaintiff reaffirms and realleges Paragraphs 1 through 88 above as if specifically affirmed and alleged herein.

90. Defendant Cotter and defendant Reid's acts and omissions described above were in violation of Title II of the ADA in that they each intentionally, or with the functional equivalent of intentional conduct, discriminated against plaintiff, a "qualified individual" under said ADA, by failing to reasonably accommodate plaintiff's disability in the course of taking plaintiff into protective custody, and thereby caused him greater harm than if he were not disabled or his disability had been reasonably accommodated.

91. As a direct and proximate result of defendant Reid and defendant Cotter's violation of the ADA as aforesaid, plaintiff was seriously and permanently injured as aforesaid.

92. In regard to claims under the ADA, defendant Town is vicariously liable for defendant Reid and defendant Cotter's aforementioned acts and omissions in regard to the events of January 6, 2018 by virtue of respondeat superior.

**WHEREFORE, PLAINTIFF JESSE ANDERSON DEMANDS:**

**A. JUDGMENT IN THE AMOUNT OF SIX MILLION DOLLARS ($6,000,000.00) AGAINST DEFENDANT TOWN OF SANDWICH;**

**B. INTEREST, LITIGATION EXPENSES AND COSTS; and,**

**C. REASONABLE ATTORNEYS FEES PURSUANT TO 42 U.S.C. § 12205**

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS**

Dated: December 11, 2020

                                                Plaintiff,
By his attorneys,


/SEC/_____
Scott E. Charnas, MA BBO No. 081240
CHARNAS LAW FIRM, P.C.
455 East 51st Street
New York, NY 10022
Tel: 212-980-6800
Fax: 212-980-1871
Email: scharnas@charnaslawfirm.com